UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | 15 CR 149-2 |
| v. ) | |
| ) | Hon. John Z. Lee |
| JONAS EDMONDS ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, respectfully submits this Sentencing Memorandum to address issues that may arise during the sentencing of defendant Jonas Edmonds.

I.  BACKGROUND

   *A.  Procedural History*

On December 4, 2015, defendant was charged in a superseding information with conspiring to provide material support to a foreign terrorist organization, specifically the Islamic State of Iraq and the Levant (ISIL), in violation of 18 U.S.C. § 2339B(a)(1) (Count One); and making a materially false statement to a law enforcement officer regarding an offense involving international terrorism, in violation of 18 U.S.C. § 1001(a)(2) (Count Two).

On December 9, 2015, under a written plea agreement, the defendant pleaded guilty to both counts of the superseding information. Under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the agreement calls for an agreed term of imprisonment of 21 years, contingent upon acceptance by the Court. Defendant is

scheduled to be sentenced on January 27, 2016 at 2:00 p.m.

### B. Offense Conduct

Beginning around January 19, 2015, defendant's cousin, Hasan Edmonds, a member of the Army National Guard of Illinois assigned to a National Guard unit in the Northern District of Illinois, engaged in online communications with UC1, a person whom Hasan Edmonds believed was an ISIL fighter in Libya but who was in fact an FBI employee. In those communications, Hasan Edmonds expressed his support for ISIL and his desire to travel to the Middle East with defendant, his cousin, to fight for ISIL. Hasan Edmonds also gave UC1 advice on how to fight and defeat the U.S. military and stated that he and defendant were willing to conduct an attack in the United States if ordered to do so. For example, on February 2, 2015, Hasan Edmonds told UC1, "For Yunus [defendant] and myself we do both want to touch down in the land and we are coming for jihad fiscibilly[1] Allah. Niether of us mind staying here if those are our orders so long as we get our sisters outta her first. Honestly we would love to do something like the brother in Paris did.[2] Hit here and then go to dawlah inshaAllah. We'll fight where ever need be."

On February 6, 2015, defendant contacted UC1 online and said that he was planning to travel with his family to Mosul, an area of Iraq controlled by ISIL. Defendant also told UC1 that if he was unable to travel, he intended to commit an

---

[1] Throughout this memorandum, quotations to the communications of defendant and Hasan Edmonds are provided verbatim.

[2] Given the context of this and other communications, Hasan Edmonds statement to doing "something like the brother in Paris did" was a reference to a January 7, 2015 terrorist attack in Paris against the satirical newspaper Charlie Hebdo.

2

attack within the United States in support of ISIL. The defendant stated "The plans are made from two points. One consists of doing all I can to be able to make hijrah[3] with my family. I already let you know that I would need for that. Two, if I cant make hijrah then InshaAllah. I can unleash the lion. What I would need…honestly nothing. I am prepared to go even if its with a rock. But a small team, no more than 5 hardware and maybe a fire cracker. I do have access to hardware." From the context of this communication and other communications between defendant, Hasan Edmonds, and UC1, it is clear that defendant was informing UC1 that, if he cannot travel, he was willing to commit an attack in the United States and that he already had access to firearms.

Over the next month, defendant asked UC1 for guidance and assistance on Hasan Edmonds' desire to travel to the Middle East to fight for ISIL.

On February 19, 2015, a confidential law enforcement source introduced defendant to UC2. Defendant believed UC2 to be an individual who could assist defendant and Hasan Edmonds with their intention of traveling from the United States to support ISIL, but UC2 was in fact an undercover FBI employee.

On March 3, 2015, defendant and UC2 met in person. During the meeting, defendant informed UC2 that he was meeting on behalf of himself and Hasan Edmonds, and that he was looking to assist Hasan Edmonds' travel to the Middle East ("I am here on my behalf and his behalf. The other brother behalf I am going to

---

[3] "Hijrah" is an Arabic word that means "migration."

3

say that and my cousin."). The two discussed the best and safest route for Hasan Edmonds to take.

Following the March 3, 2015, meeting, defendant and UC2 engaged in a series of online communications concerning Hasan Edmonds' travel. Defendant, in an attempt to facilitate Hasan Edmonds' travel to fight for ISIL, asked UC2 for a point of contact to assist Hasan Edmonds when he arrived in the Middle East.

On March 11, 2015, Hasan Edmonds told UC1 that he had purchased a plane ticket to Cairo, Egypt, in order to fight for ISIL. On March 23, 2015, UC2 met with defendant and Hasan Edmonds in Aurora, Illinois. During this meeting, Hasan Edmonds informed UC2 that he had been watching videos from "brothers from the State," referring to members of ISIL, and that he did not want peace but instead wanted fighting. Defendant expressed his support and excitement for Hasan Edmonds' travel, and said that he believed that one who supported a mujahid (a fighter) was a mujahid.

During the March 23, 2015, meeting, defendant informed UC2 that, after Hasan Edmonds traveled, he was planning to attack the Army National Guard installation to which Hasan Edmonds was assigned. Defendant advised that he wanted to conduct the attack along with UC2 and that he anticipated a "body count" of 100 to 150 individuals. Hasan Edmonds offered to provide defendant and UC2 with a list of the "rankings" of officers for defendant to kill. Hasan Edmonds also confirmed that he would provide defendant with Hasan Edmonds' military uniforms for defendant to wear during the attack on the National Guard base.

4

On March 24, 2015, defendant and Hasan Edmonds, along with UC2, drove to Hasan Edmonds' National Guard base in Joliet, Illinois, for the purpose of conducting surveillance and planning for the attack. During the drive, defendant and Hasan Edmonds discussed with UC2 the purchasing of weapons and how to conduct an attack. Upon arrival, the three also discussed, among other things, where the National Guard members conducted their training. Hasan Edmonds described the inside of the installation and which rooms they should avoid during the attack. In furtherance of the plan to commit the attack, and to determine the timing of the attack, Hasan Edmonds entered the National Guard installation and retrieved a unit training schedule, which he then gave to defendant for the purpose of deciding upon a date to conduct their planned attack.

On March 25, 2015, defendant drove Hasan Edmonds to Chicago Midway Airport so that Hasan Edmonds could travel to the Middle East to fight for ISIL. After he dropped off Hasan Edmonds at Midway, defendant went to Hasan Edmonds' residence and retrieved several of Hasan Edmonds' National Guard uniforms, which defendant planned to use as a disguise during the planned attack at the National Guard base.

On March 25, 2015, defendant was interviewed by FBI agents at the FBI field office in Chicago, Illinois. Agents asked defendant whether he had ever helped anyone travel overseas to support ISIL. Defendant responded that he had dropped Hasan Edmonds off at the airport to travel to Egypt because "he's going to visit a friend or wherever he's going. I don't know. Somebody, he's trying to move there."

5

Defendant continued by stating that Hasan Edmonds was traveling to Egypt to see if he likes it and "then he's coming back." As defendant admitted at his change of plea hearing, these statements to the FBI agents were lies. When he dropped Hasan Edmonds off at Midway Airport on March 25, 2015, defendant knew that Hasan Edmonds was traveling to Egypt to fight for ISIL—not to "visit a friend" or play tourist.

II.    **STATUTORY SENTENCING RANGE AND GUIDELINES**

    A.    *Maximum Statutory Penalties*

Under 18 U.S.C. § 2339B, Count One carries a maximum term of 15 years of imprisonment, a maximum fine of $250,000, and lifetime supervised release. Under 18 U.S.C. § 1001(a)(2), Count Two carries a maximum term sentence of 8 years of imprisonment, a maximum fine of $250,000, and a term of supervised release of not more than three years. Accordingly, the combined statutory maximum sentence includes a term of imprisonment of up to 23 years, a $500,000 fine, and lifetime supervised release.

The parties have agreed that, under Rule 11(c)(1)(C), the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons of 252 months (21 years). Other than the agreed term of incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes the agreed term of incarceration set forth, defendant may not withdraw this plea as a matter of right under Rule 11(d) and (e). If, however, the Court refuses to impose the agreed term of incarceration,

6

thereby rejecting the Plea Agreement, or otherwise refuses to accept defendant's plea of guilty, either party has the right to withdraw from the Plea Agreement.

### B. *Sentencing Guidelines*

With the possible exception of credit for acceptance of responsibility, the government agrees with the Sentencing Guidelines calculations set forth in the PSR at pages 7 to 9. Those calculations mirror the anticipated Guidelines calculations set forth in the Plea Agreement. With a total offense level is 45, and an anticipated criminal history category of VI (under Guidelines § 3A1.4(b)), the PSR calls for an anticipated Guidelines range of 276 months of imprisonment, in addition to any supervised release and fine the Court may impose.

Regarding acceptance of responsibility, the Plea Agreement anticipated that defendant would receive a three-level reduction in the combined offense level for acceptance of responsibility under Guidelines § 3E1.1. As explained below, however, acceptance has been seriously jeopardized by defendant's recent protestations of innocence in his sentencing memorandum. If defendant continues to maintain falsely that he had no intent to attack the Illinois National Guard base to which Hasan Edmonds was assigned, the government will oppose any credit for acceptance of responsibility under the Sentencing Guidelines.

A defendant is not entitled to a downward adjustment for acceptance of responsibility merely because he enters a guilty plea. *See, e.g.*, *United States v. McIntosh*, 198 F.3d 995, 999 (7th Cir. 2000); *see also* U.S.S.G. § 3C1.1 cmt. n.3. Rather, a defendant bears the burden of proving that he is entitled to a downward

7

adjustment for acceptance of responsibility. *See McIntosh*, 198 F.3d at 999. Moreover, in considering whether credit for acceptance of responsibility is warranted, a sentencing court should "assess the defendant's demonstration of genuine remorse, or conscience." *United States v. Diaz-Gaudarama*, 614 F.3d 387, 391 (7th Cir. 2010) (internal quotation marks omitted) (affirming denial of acceptance of responsibility credit in part because the defendant pleaded guilty only in "an attempt to reduce his punishment").

Here, defendant states in his sentencing memorandum that "he never would have actually gone through with, or participated in an attack on the National Guard installation." Def. Sent. Mem. at 2-3. Rather, defendant "entered into this agreement to ward off other charges that were being considered by the government, and his consideration that if other charges were brought, those charges would have exposed Jonas to a substantially higher sentence." *Id*. at 2. These self-serving interests hardly reflect the sentiments of someone who is sincerely remorseful for his conduct. Accordingly, if defendant continues to take a position at the sentencing hearing at odds with the admissions he previously made under oath, the government will have no choice but to oppose any credit for acceptance of responsibility based on the well-established law governing acceptance of responsibility. *See Diaz-Gaudarama*, 614 F.3d at 391.

### III. CONSIDERATION OF MANDATORY SENTENCING FACTORS

Under 18 U.S.C. § 3553(a), the Court must consider certain factors when determining a particular sentence for a defendant. Some of the more relevant factors

8

are the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense; afford adequate deterrence; and protect the public from further crimes by the defendant. The Court must also consider the applicable range under the advisory Sentencing Guidelines.

ISIL is a terrorist organization that has dominated the recent headlines for its horrendous acts against humanity in Iraq and Syria, and for the vicious, violent, and deadly attacks it inspires and encourages in other parts of the world. Most obvious are the Paris attacks of November 13, 2015, where 130 people were murdered, and the San Bernardino, California, attack where 14 people were murdered. The threat from this violent organization continues to impact the lives of persons around the world.

It was to this group that defendant pledged his fealty. Defendant desired to travel to the Middle East to provide support to the organization to further its violent means goals. He recognized, however, that with a family and his perceived inability to obtain a passport due to his criminal history, he would not be able to travel to Syria to fight for ISIL. Instead, he advocated for his cousin, Hasan, a National Guardsman, to travel and fight for ISIL, thus satisfying his desire to support ISIL through a proxy. For, as defendant told UC2, one who supports a mujahid is a mujahid.

Defendant's yearning to support ISIL was not satiated by simply helping his cousin travel. He wanted to do more, so he upped the ante by plotting to attack

9

Hasan's National Guard base after Hasan left for the Middle East. Defendant took steps to plan the attack by traveling to the Guard base with UC2 and Hasan in order to conduct surveillance. While outside the base, and as part of their planning, defendant and Hasan discussed the route of the attack in the base, how to identify the officers who would be killed first, and how many Guardsmen would be killed. While there, Hasan retrieved a training schedule from inside the base to identify the optimal time to murder as many soldiers as they could. Defendant stated that they (meaning defendant and UC2) would commit the attack while wearing Hasan's Guard uniforms.

Contrary to the plea agreement, defendant now asserts that he never intended on carrying out the attack. Def. Sent. Mem. at 2-3, 4. Defendant states that he was simply trying to impress an individual (UC2) whom he believed to be an ISIL fighter. These statements are ludicrous. While the government recognizes the defendant's desire to place himself in the best light possible before this Court, he is doing so at great peril and in contradiction to his sworn affirmation of the facts set forth in the Plea Agreement.

Defendant states that the "FBI employee role playing as a recruiter and representative of ISIS challenged something in Jonas Edmonds, making him want to prove he was a dedicated Muslim man. This placed Jonas Edmonds on the defensive . . ." *Id*. at 2. These statements are an attempt to minimize the defendant's conduct and are in direct contradiction to the evidence and the factual basis set forth in the

10

Plea Agreement—which defendant, in open court and under oath, acknowledged as true.

> The plea agreement clearly sets forth defendant's intentions:
>
> On March 25, 2015, defendant drove Hasan Edmonds to Chicago Midway Airport so that Hasan Edmonds could travel to the Middle East to fight for ISIL. After he dropped off Hasan Edmonds at Midway, defendant went to Hasan Edmonds' residence and retrieved several of Hasan Edmonds' National Guard uniforms, *which defendant planned to use as a disguise during the planned attack at the National Guard base.*

Plea Agreement at 6 (emphasis added).

This admission was consistent with both the evidence gathered during this investigation and common sense. It is beyond belief to dismiss as mere puffery defendant's surveillance of a military installation, meetings with a person he believed to be an ISIL operative, discussion of body counts, driving Hasan Edmonds to the airport so he could fight for ISIL, and taking of authentic National Guard uniforms in stated anticipation of a planned attack. Out of guilt, chicanery, or some other reason, defendant now states (subjectively, of course) that he never planned to attack the National Guard facility, but this is too little, too late. If defendant truly did not intend to commit this act, he should not have admitted otherwise to the Court.

Simply put, defendant's "bravado" argument ignores the evidence. When the defendant and Hasan Edmonds first began engaging with either UC, they both stated—unprompted—that they wanted to travel overseas but were also willing to conduct an attack in the United States. In his March 23, 2015, meeting with UC2, the defendant introduced, without any prompting by the UC, the plan of attacking the National Guard base. At no point had either UC1 or UC2 ever put forth any

11

notion of conducting any attack in the United States, let alone an attack on the Guard base.

Equally disingenuous is defendant's statement that "to the best of Jonas' knowledge the person who had the most knowledge about the base, and could have gained easy access to the installation was on a plane leaving the United States." Def. Sent. Mem. at 4. That may be literally true, but the statement is clearly meant to convey to the Court that the defendant lacked the ability or the know-how to conduct an attack. That is simply not true. It ignores that defendant, Hasan Edmonds, and UC2 conducted surveillance of the Guard base where Hasan instructed them as to where to go to on the base to carry out the attack, which hallways to go down and which were dead-ends, and how to make a successful escape. Even without Hasan's tutoring, the defendant's lack of complete familiarity with the Guard base was no barrier to his ability to kill a great number of our Nation's finest.

Moreover, defendant's memorandum ignores several crucial facts. For example, on March 25, 2015, after the defendant dropped Hasan off at Midway airport in order for Hasan to begin his trip to support ISIL, the defendant went to Hasan's residence and retrieved Hasan's National Guard uniforms. This act was a substantial step forward in the plan to attack the Guard base and is indicative of his true intention of fulfilling the plan. More importantly, the defendant wasted no time in picking up the uniforms, as he did so immediately after he dropped Hasan off at the airport. Revealingly, he picked up the uniforms on his own volition; that is, the UC was not with him. This was not an act of "bravado," and defendant's actions on

12

March 23 and 25 belie his current claim that he never intended on carrying through with the attack.

Had law enforcement not interceded, defendant's attack could potentially have rivaled other ISIL-inspired attacks in Paris and California. The impact of the attack—on the National Guard members, their families, and this nation's psyche—would have been devastating.

As reflected in the Plea Agreement, it remains the position of the government that the recommended sentence of 21 years of incarceration is a fair and just sentence under the facts and circumstances of this case. A term of incarceration of this length adequately accounts for the nature and circumstances of the offense, the history and characteristics of the defendant, the need to protect the public from the defendant, and would act as a potential deterrence against the defendant and others from committing a similar offense. As a result, the government will adhere to its position and recommend that the Court accept the agreed sentence contained in the Plea Agreement.

## IV. CONDITIONS OF SUPERVISED RELEASE

The defendant is currently 30 years old. If the Court accepts the plea agreement, with time off for good behavior, the defendant will be approximately 47 years old at the time of his release. One hopes that he will leave prison a law abiding pacifist but we cannot rely upon hopes and wishes in our mandate to protect the public. The government recommends, therefore, that the Court impose a term of lifetime supervised release to guard against the defendant attempting to commit any

13

attacks, or violate any laws, upon his release. Under the watchful eye of the Probation Department, a period of lifetime supervise release will serve to protect the public from the defendant and deter him, under the threat of re-incarceration, from committing further, potentially violent, offenses.

The government recommends the following conditions of supervised release:

**Mandatory Conditions**

- The defendant shall not commit another federal, state or local offense. *See* 18 U.S.C. § 3583(d); Guideline § 5D1.3(a)(1).

- The defendant shall not unlawfully possess a controlled substance. *See* 18 U.S.C. § 3583(d); Guideline § 5D1.3(a)(2).

- The defendant shall submit to the collection of a DNA sample from the defendant at the direction of the U.S. Probation Office if the collection of such a sample is authorized pursuant to 42 U.S.C. § 14135a(a). *See* 18 U.S.C. § 3583(d); Guideline § 5D1.3(a)(8).

- The defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on probation and at least two periodic drug tests, and at least two tests thereafter for use of a controlled substance. *See* 18 U.S.C. § 3583(d); Guideline § 5D1.3(a)(4).

- The defendant shall pay the assessment imposed in accordance with 18 U.S.C. § 3013. *See* Guideline § 5D1.3(a)(6)(B).

**Discretionary Conditions to Promote Respect for the Law and Deter the Defendant From Committing Future Crimes**

- The defendant shall not leave the judicial district in which the defendant is being supervised without the permission of the court or the probation officer. *See* Guideline § 5D1.3(c)(1);

- The defendant shall report to the probation officer as directed by the probation officer. *See* Guideline § 5D1.3(c)(2);

- The defendant shall follow the instructions of the probation officer. *See* Guideline § 5D1.3(c)(3);

- The defendant shall support the defendant's dependents and meet other family responsibilities. *See* Guideline § 5D1.3(c)(4);

- The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons. *See* Guideline § 5D1.3(c)(5);

- The defendant shall notify the probation officer of any change in residence, employer, or workplace within 72 hours. *See* Guideline § 5D1.3(c)(6);

- The defendant shall not frequent places where he knows controlled substances are illegally sold, used, distributed or administered. *See* Guideline § 5D1.3(c)(8);

- The defendant shall not meet, communicate, or otherwise interact with a person whom he knows to be engaged, or planning to be engaged, in criminal activity. *See* Guideline § 5D1.3(c)(9).

- The defendant shall permit the probation officer to visit the defendant at home or work at any reasonable time, and to confiscate any contraband in plain view of the officer. *See* Guideline § 5D1.3(c)(10).

- The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer. *See* Guideline § 5D1.3(c)(11).

- The defendant's employment shall be restricted to the district and division where he resides and/or is supervised, unless approval is granted by the probation officer. Prior to accepting any form of employment, the defendant shall seek the approval of the probation officer, in order to allow the probation officer the opportunity to assess the level of risk to the community the defendant will pose if employed in a particular capacity.

**Discretionary Conditions to Ensure Safety to Others**

- Defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon. *See* 18 U.S.C. § 922(g); Guideline § 5D1.3(d)(1).

## CONCLUSION

Based on the foregoing, the government respectfully recommends that the Court accept the parties' agreement to a sentence of 21 years of incarceration. In addition, the government recommends that defendant be sentenced to a lifetime of supervised release.

                              Respectfully submitted,

                              ZACHARY T. FARDON
                              United States Attorney

By:    */s/ Barry Jonas*
           BARRY JONAS
           JOHN KNESS
           Assistant United States Attorneys
           219 South Dearborn Street
           Chicago, Illinois 60604
           (312) 353-5300