```
 1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   UNITED STATES OF AMERICA,      )  Docket No. 15 CR 149-2
                                    )
 4                  Plaintiff,      )
                                    )
 5         v.                       )  Chicago, Illinois
                                    )  September 20, 2016
 6   JONAS M. EDMONDS,              )  11:00 o'clock a.m.
                                    )
 7                  Defendant.      )

 8            TRANSCRIPT OF PROCEEDINGS - SENTENCING
              BEFORE THE HONORABLE JOHN Z. LEE
 9
     APPEARANCES:
10
     For the Government:        HON. ZACHARY T. FARDON
11                              United States Attorney
                                BY:  MR. BARRY JONAS
12                                   MR. JOHN F. KNESS
                                Assistant United States Attorneys
13                              219 South Dearborn Street
                                Chicago, Illinois 60604
14
     For the Defendant:        LAW OFFICES OF JAMES A. GRAHAM
15                              BY:  MR. JAMES A. GRAHAM
                                53 West Jackson Boulevard
16                              Suite 703
                                Chicago, Illinois 60604
17

18

19

20
                       ALEXANDRA ROTH, CSR, RPR
21                     Official Court Reporter
                       219 South Dearborn Street
22                            Room 1224
                       Chicago, Illinois 60604
23                          (312) 408-5038

24

25
```

1      (Proceedings had in open court:)

2           THE CLERK:  Case 15 CR 149-2, USA versus Jonas

3  Edmonds, for sentencing.

4           MR. JONAS:  Good morning, your Honor.  Barry Jonas and

5  John Kness for the United States.

6           MR. GRAHAM:  Good morning, Judge.  Jim Graham on

7  behalf of Jonas Edmonds, who's coming out.

8           MR. GROOMS:  Good morning, your Honor.  Troy Grooms,

9  G-r-o-o-m-s, for probation.

10          THE COURT:  Good morning, counsel.  Good morning, Mr.

11 Edmonds.

12          We are here for the sentencing hearing in the case

13 United States versus Jonas Edmonds, 15 CR 149-2. before we

14 proceed, I am going to ask Ms. Acevedo to please swear in Mr.

15 Edmonds.

16          MR. GRAHAM:  Judge, it would be an affirmation.  We

17 dealt with this before.

18     (Defendant duly affirmed.)

19          THE COURT:  All right.  So, Mr. Graham, have you had

20 an opportunity to review the presentence investigation report?

21          MR. GRAHAM:  Yes, Judge.

22          THE COURT:  And have you reviewed the recommended

23 conditions of supervised release that are contained in the

24 report?

25          MR. GRAHAM:  Yes, Judge.

1    THE COURT:  Mr. Edmonds, have you had an opportunity

2  to review the presentence investigation report and discuss it

3  with your attorney?

4    THE DEFENDANT:  Yes.

5    THE COURT:  Is there anything about the presentence

6  investigation report that you would like to discuss with your

7  attorney before we proceed?

8    THE DEFENDANT:  No.

9    THE COURT:  All right.  Let's first deal with the

10  sentencing guideline calculation set forth in the presentence

11  investigation report.  I have reviewed all of the sentencing

12  memoranda submitted by the parties.

13    I take it from the defendant's sentencing memorandum

14  that there is no objection to the factual findings in the

15  presentence investigation report, is that correct, Mr. Graham?

16    MR. GRAHAM:  That's accurate, Judge.

17    THE COURT:  How about the government?

18    MR. JONAS:  No --

19    THE COURT:  Do you have any objections?

20    MR. JONAS:  No objections.

21    THE COURT:  All right.  Very well.

22    Similarly, based on the sentencing memoranda, I take

23  it that defendant does not have any objections to the

24  sentencing guideline calculations that are set forth in the

25  presentence investigation report, is that correct?

1      MR. GRAHAM:  No, Judge, we have no objection to that.

2      THE COURT:  How about the government?

3      MR. JONAS:  No objection, Judge.

4      THE COURT:  There is one issue that I wanted to raise

5  with the parties, and that's with regard to the term of

6  supervised release with regard to the first count under 18

7  U.S.C. Section 2339B(a)(1).  Now, I see that under the plea

8  agreement the parties have agreed the maximum term of

9  supervised release with regard to that first count could extend

10  up to life?

11      MR. GRAHAM:  That's purely by statute, Judge.  So it's

12  not an agreement between the parties as to what the supervised

13  release period would be.  But that's what the statute permits

14  your Honor to do if your Honor feels that's appropriate.

15      THE COURT:  And that's actually exactly what I want to

16  talk to the parties about, because at least as I understand it,

17  a violation of 18 U.S.C. 2339B(a)(1) qualifies as a Class C

18  felony, with the maximum term of supervised release under 18

19  U.S.C. Section 3583 of three years.  And I wondered -- and that

20  was consistent actually with the PSR finding that was issued in

21  the Hasan Edmonds portion of the case.

22      And so I wondered if the parties could clarify their

23  positions with regard to the maximum term of supervised release

24  for me.

25      Mr. Jonas?

1    MR. JONAS:  Your Honor, it is -- the statutory maximum

2    is life.  And if I can have a moment to find where in the

3    guideline -- the code it says, I have seen it.  I read it.  I

4    just don't remember the specific section off the top of my

5    head.

6        (Brief pause.)

7        MR. JONAS:  Your Honor, Title 18, United States Code

8    Section 3583, subsection J.

9        THE COURT:  Okay.

10       MR. JONAS:  That subsection says:  Notwithstanding

11   subsection B, the authorized term of supervised release for any

12   offense listed in Section 2332B subsection (g)(5)(B) is any

13   term of years or life.  If you turn to 18 U.S.C. 2332B

14   subsection (g)(5)(B), that includes -- 2339B is one of the

15   statutes listed.  That's on page 990 of the code, Judge.

16       (Brief pause.)

17       THE COURT:  Okay.  I guess what I'm looking at is -- I

18   have a copy of that exact provision.  18 U.S.C. 2332B and

19   '32B(a) under prohibited acts, under offenses, notes:  Whoever

20   involved -- involved in conduct transcending national

21   boundaries and in circumstances described in Section B.  So I

22   guess that would lead us to Section B then, right?

23       MR. JONAS:  It's -- one second, your Honor.

24       (Brief pause.)

25       MR. JONAS:  Sorry, Judge.  I am flipping back and

1   forth between pages.

2          Just to go back to 18 U.S.C. 3583, subsection (j),

3   that specifically references under Section 2332 small (b),

4   which is the statute your Honor is referring to, not subsection

5   (a) prohibited acts, but subsection (g)(5)(B).  So it says:

6   Any statute or any offense listed under that specific

7   subsection, (g)(5)(B), capital (B), is subject to a term of

8   supervised release of life.

9          So going further in 2332B, past subsection (a), all

10  the way to subsection (g), the definition section, that's where

11  you find the statutes or the offenses listed that are subject

12  to a term of supervised release of life.

13         And, your Honor, we can, during the sentencing of Mr.

14  Hasan Edmonds, address I guess an objection or correction to

15  that sentencing report.

16         THE COURT:  Okay.  All right.  Very well.

17         Mr. Graham, I take it that you have no basis to object

18  to the government's interpretation of that statute?

19         MR. GRAHAM:  No, Judge.  I mean, only to say that your

20  Honor doesn't have to impose a supervised release term of life.

21  Obviously you can go substantially less than that.

22         THE COURT:  All right.  Very well.

23         So I have reviewed the presentence investigation

24  report, and the sentencing memoranda submitted by the parties,

25  as I have stated.  And so based upon the memoranda, statements

1    by counsel here today, and my own review of the presentence

2    investigation report, I find that the defendant's total offense

3    level is 42, and his criminal history category is 6.

4         As to Count 1, the maximum term of imprisonment is 15

5    years, and the maximum term of supervised release is up to

6    life.  The statutory maximum fine is $250,000.

7         As to Count 2, the maximum statutory term of

8    imprisonment is eight years.  The maximum term of supervised

9    release is three years.  And the statutory maximum fine is

10   $250,000.

11        Accordingly, the maximum statutory term of

12   imprisonment for both counts is 23 years.  The maximum term of

13   supervised release can be up to life when the two counts are

14   taken together.  And the statutory maximum fine is $500,000.

15        The sentencing guideline calculation yields a

16   guideline range of incarceration of 360 months to life.

17   However, because the maximum period of incarceration authorized

18   by statute for the two counts is 23 years, at 276 months, and

19   that is less than the maximum of the applicable guideline

20   range, the sentencing guideline range for imprisonment in this

21   case is 276 months.

22        In addition, the sentencing guideline range for

23   supervised release as to Count 1 is up to life, and as to

24   Count 2 is one to three years.  And the range for the fine is

25   25,000 to $250,000.

1    Furthermore, a special assessment of $100 is mandatory
2 for each count, bringing that total to $200.
3    In this case, the parties have entered into a plea
4 agreement under Rule 11(c)(1)(C) That calls for an agreed term
5 of incarceration of 21 years.  It is up to the Court to accept
6 or reject the plea agreement on that basis.  Previously I have
7 preliminarily accepted the plea agreement, leaving any final
8 approval for today's sentencing hearing.
9    So in addition to the advisory sentencing range under
10 the sentencing guidelines, the Court is to consider the other
11 factors that are set forth in 18 U.S.C. Section 3553(a) in
12 terms of sentencing.  Those factors include the nature and
13 circumstances of the offense and the history and
14 characteristics of the defendant; the need for the sentence
15 imposed to reflect various factors, including the seriousness
16 of the offense, the need to promote respect for the law, to
17 provide just punishment for the offense, to afford adequate
18 deterrence to criminal conduct, to protect the public from
19 further crimes of the defendant, and provide defendant with any
20 needed educational training, vocational training or other
21 correctional treatment.
22    I am also to consider the kinds of sentences available
23 and advisory sentencing range under the sentencing guidelines
24 that I discussed.  I am also to consider the need to avoid
25 unwarranted sentencing disparities, as well as the need to

1    provide restitution to any victims of the offense.

2          Now, as I said, I've reviewed the memoranda that was

3    submitted by the parties as well as all the other materials in

4    this case. I did, however, want to provide counsel today with

5    an opportunity to address those factors, as well as anything

6    else that counsel maybe deemed relevant to the plea and

7    sentencing of the defendant. I'd also like you to address the

8    issue of the term of supervised release.

9          So, Mr. Graham, I give the floor to you.

10          MR. GRAHAM: Judge, obviously Mr. Jonas Edmonds has

11    taken a plea in this case. We are urging you, as the

12    government is, accepting the plea. Obviously under an

13    11(c)(1)(C) plea agreement, your Honor can accept it or reject

14    it. But you can't change the sentencing components.

15          Obviously the things that your Honor would decide were

16    the period of supervised release and also whether or not a fine

17    should be imposed, things basically along those lines.

18          My client has gone ahead and pled guilty to a material

19    support count as well as giving a false statement to the

20    federal agent -- agents regarding a national security issue.

21    Obviously that's from a superseding information that my client

22    waived an indictment for.

23          This is a case where and 11(c)(1)(C) or an agreed

24    sentencing component has been entered into by the parties. My

25    client has not cooperated. And so that's somewhat of an

1    unusual circumstance.

2            Judge, there have been various issues that have come

3    up recently about the second matter, which is the issue

4    regarding any kind of an attack on the National Guard base.

5    Obviously, material support could be supported by one of two

6    things, one of which is Mr. Jonas Edmonds' support of his

7    cousin getting on a plane and going to Egypt to fight for ISIS.

8            On the other hand, the other issue is whether or not

9    the National Guard base planning was something that is also

10   included in that material support count.  It's our belief,

11   Judge, that that material support count is substantiated by

12   just his help of the cousin going overseas.

13           It's pretty clear that he was on tape, and that he was

14   going ahead and talking with an FBI undercover informant about

15   a plan to go ahead and attack the National Guard base.  There

16   were various different things that were done in support of

17   that, one of which was going out to the actual National Guard

18   base.  And there was also conversations about some planning

19   along those lines.

20           On the other hand, there were an enormous amount of

21   steps that were not taken in this case.  I noticed that the

22   government has a duffle bag, and they are going to, I'm sure

23   show, your Honor some uniforms where my client after he had

24   dropped his client -- his cousin off at the airport had gone to

25   the grandmother's house and picked up various different

1    clothes, which included those uniforms.  There is no question

2    that that was done.

3         On the other hand, there were no guns procured.  There

4    was no date that was set in terms of any kind of an attack on

5    the National Guard base.  And my client has literally no

6    background whatsoever in firearms.  And he did nothing to go

7    ahead and train himself or enter into any kind of practice to

8    get skilled with either a rifle, a pistol or any kind of an

9    automatic weapon.  There were massive steps that needed to be

10   taken, and those steps were not taken.

11        Many of the things in the government's sentencing

12   memorandum compare Jonas Edmonds to other people that have

13   actually gone ahead and followed through with actual attacks,

14   which includes Paris and California and Texas and other places.

15   In those cases obviously massive numbers of people died.

16        This is not one of those cases.  This is a case where

17   my client stands before you, and he states that he would not

18   have actually committed an attack on the National Guard base,

19   even though obviously his statements support that he was

20   conspiring to go ahead and do that.

21        Judge, there is a lot of information in this case that

22   Jonas Edmonds was taking a great deal of marijuana and smoking

23   marijuana on a regular basis up until the time that he was

24   arrested.  And he is basically just saying to your Honor that

25   he would not have followed through with it.  And the

1    government's conclusion that this was a foregone conclusion and
2    that this would have happened is not accurate.

3         Now, we're not casting any aspersions, and we're not
4    saying that the investigation was done by the agents in any
5    wrongful way.  I think what they were doing was their job.  And
6    they obviously arrested Jonas Edmonds when they felt it was
7    appropriate.  But obviously there were a lot of steps to be
8    taken in this that were not taken.

9         Judge, additionally, there are other counts that Mr.
10   Jonas Edmonds could have been charged with if, in fact, he was
11   going to conspire to commit murder.  One of which is Title 18
12   Section 1117, which is conspiracy to commit murder.  Mr. Jonas
13   Edmonds was not charged with that, and he did not plead guilty
14   to that.  What he did plead guilty to was material support.

15        So where we stand with things is this:  He obviously
16   is asking your Honor to go ahead and affirm the deal that the
17   government and he have entered into.  We're asking for a
18   smaller period of supervised release, maybe something in the
19   area of five or ten years.

20        And I am considering one thing, Judge; and that is
21   that Jonas Edmonds is going to be almost 47 or 50 years old by
22   the time he is released from custody.  So he is not going to be
23   a young man when that takes place.  And I guess the question on
24   it is, what at this point you feel is an appropriate period of
25   supervised release when he attains that age.  And we feel that

1    five or ten years would be an appropriate period considering

2    how old he is going to be when he is released from custody.

3            In terms of fine, Judge, obviously from the

4    presentence investigation report, your Honor can see that Jonas

5    Edmonds has no financial wealth.  He has a wife.  He has a

6    baby, and he has some stepchildren.

7            When he is released from custody, I am sure family

8    members and himself will need to go ahead and support himself

9    and, you know, whatever family members are out and about.

10           We're asking for a couple of other things, one of

11   which is, his family lives in Philadelphia, Pennsylvania.  And

12   I filed a motion asking your Honor to recommend a facility

13   close to that location.  I think in this kind of a case, due to

14   the fact that there is national security issues, I am not sure

15   exactly where they would place Mr. Edmonds.  It may not be the

16   normal course of placing just an individual at any Bureau of

17   Prisons facility.  So we would ask for a facility as close to

18   Philadelphia, Pennsylvania, as possible.

19           And obviously, my client and everybody understands

20   that that's a recommendation, and the Bureau of Prisons is free

21   to either take or reject that recommendation.  But we would

22   request your Honor to go ahead and do that.

23           My client would like to put all this behind him,

24   Judge, which is why he went ahead and took the plea.  And we

25   ask your Honor to go ahead and affirm the deal.

1    THE COURT:  Mr. Graham, other than the term of the
2    supervised release, do you have any objections to the
3    recommended conditions for supervised release that are
4    contained in the presentence investigation report or that the
5    government requests?

6    MR. GRAHAM:  There was only one thing that caught my
7    eye.  There is on page 22, item 9, and it's the second box
8    checked, which is, that -- well, No. 1, 9 refers to a sex
9    offender treatment program.

10    Now, I recognize that this -- and obviously this has
11    nothing to do with a sex offender.  But there is a computer and
12    internet monitoring program, which I understand why it is that
13    probation may be looking for that.

14    There is also a box listed talking about the cost of
15    monitoring.  And we would ask that if your Honor has -- or
16    affirms the idea that Mr. Edmonds has to comply with the
17    components regarding computer and internet monitoring program,
18    that the cost of that be waived.

19    In addition to that, on the next page there is a
20    listing under No. 11, which is that he not enter into any
21    agreement to act as an informer or special agent of law
22    enforcement agency without the permission of the Court.  Mr.
23    Jonas Edmonds has not and is not cooperating with the
24    authorities.  And I don't know that -- I recognize this might
25    just be something that's standardly checked.  But I don't know

1    that this item is necessary in this case.

2            THE COURT:  Very well.  Mr. Graham, also I noticed

3    that the government requested an additional provision, which is

4    that prior to accepting any form of employment while on

5    supervised release, that Mr. Edmonds seek the approval of the

6    probation officer in order to allow the probation office the

7    opportunity to assess level of risk to the community the

8    defendant will pose if employed in a particular capacity.  Is

9    there any objection to that provision?

10           MR. GRAHAM:  Judge, I don't know that it's necessary.

11   Obviously he is going to get a probation officer, and that

12   officer is going to be working with him.  And obviously if that

13   officer feels that there is a problem, they would have the

14   ability to go in front of the Court and make those thoughts

15   known.

16           THE COURT:  Very well.  Thank you, Mr. Graham.

17           Mr. Jonas?

18           MR. JONAS:  Thank you, Judge.

19           Let me preface what I am about to say with, I am not

20   trying to blow up this deal.  We support, endorse the plea

21   agreement and the 21 years that the parties are recommending.

22           Having said that, I take great issue with what the

23   defendant is saying about his intention not to commit this

24   crime.  I think that he is wholly trying to minimize his

25   conduct, conduct that which he himself initiated.  Not an

1    undercover agent but himself.

2          And I -- the government has laid out a lot of conduct

3    in the offense in its sentencing memorandum.  There are some

4    highlights I'd like to hit, just to address this point.  And I

5    think it's important because I think it supports the

6    government's position for lifetime supervised release.

7          This case started out with the defendant and his

8    cousin online communicating with people who they believed were

9    members of ISIS, the terrorist organization.  And they were

10   independently of each other communicating with different

11   people.  And it wasn't just the undercover agents, but there

12   were others as well.

13         And the defendant himself is communicating with

14   someone who introduces him to what we refer to as UC2,

15   Undercover 2.  Hasan Edmonds in separate from that is talking

16   to UC1.  And they talk about collectively and independently of

17   each other wanting to travel overseas to join ISIS and bring

18   the families with them.  They both also independently talk

19   about if they get orders, they will commit an attack here in

20   the United States.

21         So the whole notion of the attack in the United

22   States, and specifically the attack on the guard base, is all

23   wrapped up in the material support of Hasan Edmonds ultimately

24   traveling overseas, something Jonas Edmonds himself wanted to

25   do initially but then shies away from.  It's not two separate

1    independent acts.  It's all one big conspiracy, one big

2    venture.

3            Jonas Edmonds then meets the undercover agent, and

4    they talk about Hasan Edmonds traveling, what Hasan Edmonds

5    needs to do.  And that's where sort of the undercover agent's

6    focus was, travel overseas.

7            They had a second meeting in March 23 at Jonas' house.

8    And Jonas springs the idea of committing this guard base.

9    Again, it's coming from him.  I can tell you, Judge, it was a

10   surprise to us when we heard it, seemed to come out of nowhere.

11   But, of course, we're not going to -- the undercover agent in

12   doing his job followed up because we need to know how far did

13   he progress.

14           And Mr. Edmonds -- sorry -- Mr. Graham says, Jonas

15   Edmonds, there were a lot of steps he didn't take.  Well,

16   because he just never got to that point because the government

17   interceded.  Be irresponsible of us to let him take his plot to

18   the very end where he's actually shooting people before we

19   arrest him.

20           So Jonas Edmonds raises on his own the notion of the

21   guard base.  And he talks about this terror cell he has.  He

22   mentions a guy named Cody.  And in fact, there was

23   communication with someone named Cody on the West Coast about

24   committing attacks.  He mentions other people in the undercover

25   agent.  He's talking about a cell I believe of four or five.

1    And he talks about his cousin.

2          The next day they travel down to Aurora to -- to

3    conduct surveillance on the guard base.  And then the

4    communications -- we're going to play some of these recordings

5    this afternoon, Judge.  They talked about the attack, how they

6    are going to kill a hundred fifty guardsmen.  And this is

7    coming from the defendant.

8          Mr. Graham says, the defendant did not have any access

9    to weapons during the training.  One of the things the

10   defendant says in this car ride is that, quote:  He's glad my

11   uncle taught me how to use one of them things that aim

12   properly.  Talking about guns.

13         He also tells the undercover agent he has a cousin who

14   has kidney disease that has access to AK-47s.  And they talk

15   about how much it would cost to buy those AK-47.

16         Well, sure enough, the defendant has a cousin who

17   is -- I won't say his name but he's a member of the gang, who

18   does have a kidney disease, who does have firearms and

19   possesses firearms and has access to firearms.

20         So when Jonas Edmonds is telling the undercover agent

21   he can get weapons, that's not blustering.  That's factual.  So

22   he is saying all the things that support his desire to commit

23   the attack.  It wasn't on probing of the undercover agent.  It

24   was on his own volition.

25         He tells the undercover agent that after Hasan Edmonds

1   leaves -- and this is an important point, Judge.  The

2   undercover agent had no idea that Hasan Edmonds had already

3   purchased plane tickets to travel to Egypt with the notion of

4   traveling on.  They had talked about it.  But Hasan Edmonds on

5   his own went ahead and purchased plane tickets on a time table

6   that was accelerated from what the defendants were telling the

7   undercover agents.  They were telling the undercover agents, I

8   think it was June they were talking about going.  And all of a

9   sudden in March Hasan buys his plane ticket.

10          So Jonas is telling the undercover agent, Hasan

11   leaves.  I'll get his uniforms, and we'll do the attack.  And

12   they didn't set a date, but they were moving in that direction.

13          The next day, March 25, Hasan Edmonds has his flights,

14   and Jonas takes him to the airport.  He drops Jonas Edmonds

15   off -- sorry -- Hasan Edmonds off knowing where he is going,

16   knowing the purpose of his trip, to join ISIS.  Of course, he

17   lies about it to the FBI later that evening, and that's part of

18   Count 2.

19          Jonas Edmonds then takes the first step -- maybe not

20   the first step but the next step to commit the attack.  He goes

21   to Hasan's home.  And what does he pick up?  This duffle bag

22   that was found in Jonas' van later that night.  It says,

23   Edmonds, on it.  In the duffle bag are Hasan Edmonds' uniforms

24   that Jonas was going to wear to commit the attack on the guard

25   base.  All filled with guard material, guard clothing.

1       This was the next step that he took to commit the

2   attack.  And the FBI in doing the right thing stopped him at

3   that point because it would be irresponsible of them to let him

4   go ahead and take another step because we obviously didn't have

5   complete control over him, as evidenced by the fact that Hasan

6   was on his own buying plane tickets without any communication

7   of the undercover agents, either undercover agent.

8       This demonstrates clearly that Jonas Edmonds was going

9   to carry out the attack that he so clearly told the undercover

10  agent about.  Thank god the FBI was there to stop them because

11  we've seen in the world today, these attacks can be horrific

12  and go beyond just killing people but have an impact on the

13  psyche of the community that's irrepairable.

14      Mr. Graham talks about, regarding lifetime supervised

15  release, which the government beliefs is appropriate here, that

16  Mr. Edmonds will be 50 years old when he gets out, be an old

17  man, incapable of committing this attack or more attacks.

18  That's -- 50 years old is not old, Judge.  I am older than 50.

19  I am able to commit attack if I wanted to, not that I have any

20  desire to do so.  Jonas Edmonds when he's released from prison

21  can easily get another weapon, go out in the street and start

22  shooting people.  So 50 is not old.  He needs to be monitored

23  for the rest of his life.

24      Finally, with regard to the fine, we take -- we take

25  no position.  We recognize he doesn't have a lot of money.  We

1    leave that to the discretion of the Court.

2            With all that, Judge, we are endorsing the 21 years.

3    We do think in this case, with this defendant, it is a fair

4    sentence.  Mr. Graham talks about other charges that could have

5    been brought.  Yes, we were considering other charges.  But we

6    came to this agreement prior to us bringing the charges.  And

7    we didn't bring additional charges because of the agreement.

8    The government made a decision that at the early stage of the

9    prosecution, saving government resources, both affirmatively

10   and additional investigation, but also with regard to

11   classified filings, that a 21-year sentence was appropriate at

12   that time.

13           But we do believe that lifetime supervised release is

14   also not only appropriate but necessary.  Thank you.

15           THE COURT:  Thank you, Mr. Jonas.

16           Mr. Jonas, does the government have any objections to

17   the recommended provisions of supervised release, the

18   conditions of supervised release?

19           MR. JONAS:  No.  No, Judge.  We do request that one

20   additional factor that we raised in our sentencing memo.

21           THE COURT:  All right.  Mr. Graham, anything in reply?

22           MR. GRAHAM:  Judge, a few things, Judge.  I recognize

23   why it is that the agents stepped in and arrested Mr. Edmonds

24   when they did.  There are a lot of cases in this district and

25   other districts where somebody is actually pushing a button on

1    a bomb, you know, for a bar or something along those lines.

2    There are stash house cases where somebody, a group of

3    individuals, are arrested as they are getting in the van about

4    to do the robbery.

5           Those are different kinds of cases.  Those are things

6    that are imminent.  And obviously it's pretty clear what the

7    defendants' intentions are.

8           I know that the government likes for press purposes to

9    say this was a foregone conclusion.  But frankly, it wasn't.

10    There were a lot of steps that needed to be taken and a lot of

11    steps that were not taken.  And that's a long way from where we

12    are.

13           That's all I have to say.

14           MR. JONAS:  Your Honor, if I can just briefly respond?

15           THE COURT:  Go ahead.

16           MR. JONAS:  One of the factors in this case that

17    determined when a defendant was arrested was the fact that

18    Hasan Edmonds had gone through security at O'Hare Airport -- I

19    believe it was Midway.  Can't remember.  One of the airports.

20           THE COURT:  I believe it was Midway.

21           MR. JONAS:  Midway, right, because he was traveling to

22    Detroit and from Detroit to Egypt.  We couldn't let him get on

23    the plane because, you know, we don't know what he would have

24    done on the plane.  We didn't want to lose control over him.

25    So once Hasan Edmonds went through security, we arrested him.

1          Then the question became, at some point in the next 24

2    hours, Hasan Edmonds would be landing overseas and would be

3    able to reach out to Jonas, let him know he made it.  And if

4    Jonas didn't get that call, it would be probably suspicion on

5    his part.

6          So that's why we arrested Jonas Edmonds when we did.

7    It was time to coincide with the arrest of Hasan Edmonds, get

8    them both.

9          But I come back to my other report -- other point as

10   well.  It would have been irresponsible to let him continue on

11   out there.

12         THE COURT:  All right.  Thank you, Mr. Jonas.

13         Mr. Graham, is there anyone present who wishes to be

14   heard on behalf of Mr. Edmonds?

15         MR. GRAHAM:  Judge, his family is out of state.

16   Obviously the probation officer spoke with his wife.

17         THE COURT:  There is someone raising their hand.

18         MR. GRAHAM:  I know that's Hasan's father.  But I do

19   not plan to call him as a witness.  He may or may not plan to

20   speak this afternoon.

21         THE COURT:  Okay.  Mr. Jonas, anyone that the

22   government wants to offer today?

23         MR. JONAS:  Not for this sentencing, Judge.

24         THE COURT:  All right.  Mr. Edmonds, you have the

25   right to address the Court before I determine your sentence and

1    determine whether or not I am going to accept the plea

2    agreement that you and the government entered into.  You may

3    choose to waive that right after speaking with your attorney if

4    you wish.  But you have the right to address the Court today.

5              Would you like to address the Court?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Can you please step up to the mike.

8              You may proceed, sir.

9              THE DEFENDANT:  First and foremost, I do acknowledge

10   the actions that I -- my actions and my role in this.  But one

11   thing that the government refuses to admit and refuses to bring

12   up is that they -- the FBI agent not only enticed but

13   encouraged these statements and these actions.  Before the FBI

14   agent there was no conspiracy.  There was -- there was none of

15   that.

16             And during the time with the agent, yes, I asked him

17   in the first meeting that is on surveillance, when he told me

18   that he had a sheik, which is a religious leader, somebody that

19   we, the normal Muslims, look up to and we seek guidance in.

20             And once he told me he had a sheik, I asked him

21   specifically to question his sheik about what I should do as

22   far as being a Muslim in this country that cannot leave.  I

23   went to him for guidance, and the guidance that they gave me

24   was this, which had me here right now.

25             You know, they did -- they talk a lot about this

1  conspiracy.  I acknowledge I got my cousin off at the airport.

2  Yes, I acknowledge that.  I pled guilty to that.  But this

3  conspiracy that they keep trying to hammer in and make it into

4  something that it was not -- one of the main things that prove

5  that I wasn't going to do that is the fact that my cousin

6  bought a ticket way before they even thought he would buy one.

7  Like he said with the agent, it was supposed to be somewhere in

8  June maybe.  I don't know.  But my cousin bought one in March.

9       The reason my cousin bought one in March was because

10 it was understood between me and him that the guy that was

11 betraying himself to be a Muslim, we weren't going to deal with

12 that guy.  That guy was just courtesy, really.  And, yes,

13 terrible decision on my part to -- to indulge those type of

14 things.  But there was never any intention to go any further

15 than what was asked of me.

16      As far as these -- this bag that has Hasan's name on

17 it with his uniforms in it, they also refused to acknowledge

18 the fact that my grandmother was moving.  Everything in the

19 house was packed.  It was my job to help her move, and it was

20 my responsibility to get my cousin's stuff out of the house.

21 In my van, there wasn't just a bag with his stuff in it, with

22 his uniforms in it.  There was all of his stuff, well, majority

23 of his belongings I had in my van.

24      So it was -- the idea that I went to go get his

25 uniforms to use them for whatever reason, that is not accurate.

1  The fact is, I got all of his stuff.  And the fact is that I

2  never had intentions on continuing to deal with the agent after

3  Hasan left.  And that is why Hasan chose to leave when he left.

4          I dropped my cousin off.  I made some bad decisions,

5  had some conversations that I shouldn't have had, you know.  I

6  accept that.  But the person that they are trying to make me

7  into, not that person.  As everything clearly keeps bringing

8  up, you know, I have extracurricular activities that I indulge

9  in.  Not many extremist, military, radical that they try to

10 make me into.  Smoke marijuana, on the regular, every day.

11         So I'm clearly not that person that they are trying to

12 make me into.  And if they would have never came and, you know,

13 encouraged and incited and gave me the opportunity to be -- or

14 gave me the opportunity to indulge in those conversations, I

15 would still be the normal person living a regular life out

16 there in the whole, smoking weed, taking care of my family,

17 trying to get my business off the ground.

18         That's where I've been the past five years.  And the

19 fact, that I am going to miss the next 17, 18 years of my

20 child's life, which is my life is revolving around that, my

21 children, my wife and my kids, is more than enough punishment.

22 Sufficient for the role that I played in all of this.

23         THE COURT:  Thank you, Mr. Edmonds.

24         Anything else from counsel?

25         MR. JONAS:  No, Judge.

1    THE COURT: All right. We will take a brief recess at
2    this time.
3        (Brief recess.)
4        THE COURT: Having reviewed the presentence
5    investigation report, the sentencing submissions by the
6    parties, the arguments from counsel and statements made by
7    defendant here today, the Court hereby accepts the plea
8    agreement pursuant to Rule 11(c)(1)(C) and the sentence to
9    which the parties agreed.

10        In arriving at this determination and sentence I have
11   considered a number of factors. I have considered the advisory
12   sentencing guideline range.

13        Turning to the nature and circumstances of the
14   offense, the Court finds that the actions of defendant and
15   co-defendant Mr. Hasan Edmonds were harrowing to say the least.
16   Mr. Edmonds and his cousin, who was a member of the Illinois
17   Army National Guard, devised and acted on a grievously
18   disturbing plot, whereby defendant would help his cousin leave
19   the country for Egypt to fight for the so-called Islamic State
20   of Iraq and the Levant, or ISIL, while defendant himself used
21   the information and uniforms provided by his cousin to enter
22   the Illinois National Guard installation in Aurora, and there
23   kill, in his own words, a hundred to a hundred and fifty
24   National Guardsmen while they were training.

25        It is difficult to conceive of a more contemptible

1   crime against the country and its people than misusing the

2   trust that the country has bestowed upon one of its soldiers,

3   who took the oath to safeguard the republic in order to carry

4   out the mass killing of soldiers who are preparing to defend

5   it.

6           Defendant also aided in Hasan Edmonds' plan to join

7   ISIL and fight on its behalf.  These actions too necessitate a

8   significant sentence.  And to make matters worse, defendant

9   lied to federal investigators when questioned about the purpose

10  and circumstances surrounding Hasan Edmonds' travel to the

11  Middle East.

12          In his sentencing memorandum, Mr. Edmonds attempts to

13  minimize his actions by claiming that the planning was all just

14  bull talk, quote unquote.  But the record demonstrates that Mr.

15  Edmonds and his cousin were doing much more than just talking.

16  They took affirmative steps to carry out their plan.

17          For example, defendant along with Hasan Edmonds and

18  the undercover agent drove to the National Guard facility to

19  surveil it.  Hasan Edmonds then described the layout of the

20  facility and went inside to obtain a training schedule so that

21  defendant could best time the attack.  Then after defendant

22  dropped Hasan Edmonds off at the airport, he went immediately

23  to the home and retrieved the uniforms that they were planning

24  to use for the attack.

25          The Court finds it significant also that it was Mr.

1    Edmonds and his cousin who first told the undercover agent that

2    they were willing to commit attacks in this country, and they

3    were the ones that first raised the idea of attacking the

4    National Guard facility.  Defendant argues that no guns were

5    found by the government at either of the residences.  But the

6    Court notes that there were substantive discussions about the

7    procurement of guns that Mr. Edmonds had both with Hasan

8    Edmonds and with the undercover agent, and that this discussion

9    was not idle chatter.

10         Furthermore, it is clear from the defendant's prior

11   conviction in 2004 of armed robbery that defendant could obtain

12   guns if and when he chose to do so.

13         Defendant also tries to distinguish this case from the

14   other tragedies that the public is aware of.  But here the

15   Court finds it was only fortuitous that the plot was stopped

16   and the calamity was avoided.

17         Defendant's further argument says that a lot of steps

18   were not taken that could have been taken.  But in reality, the

19   only steps that remained was getting a gun and going out and

20   carrying out the attack.  Given the potential devastating

21   consequences that such an attack would have, the government's

22   decision to arrest Mr. Edmonds when it did was prudent and

23   entirely reasonable.

24         In short, defendant's actions were contemptible and

25   disgraceful and warrant a significant and severe sentence.

1          Turning to Mr. Edmonds' history and characteristics,

2     the Court notes that Mr. Edmonds does have three criminal

3     history points for conspiracy to commit armed robbery in 2004.

4     And as I said, although the Court notes that this was some time

5     ago, thereby blunting its significance, it does show that the

6     defendant has the capability and did have the capability of

7     obtaining a firearm when he needed one.  And this, as I noted,

8     weighs against his argument that the government didn't find any

9     firearms at his house.

10          Turning to his personal circumstances, the Court

11     recognizes Mr. Edmonds grew up in difficult circumstances.  His

12     father and his mother separated before he was born, and he did

13     not have the benefit of a stable family environment.  He also

14     has a wife and daughter in Philadelphia, who continue to

15     provide him with emotional support, as set forth in the

16     presentence investigation report.  And I consider those factors

17     to be somewhat mitigating factors.

18          Mr. Graham, are there any other arguments in

19     mitigation that I failed to address?

20          MR. GRAHAM:  No, Judge.

21          THE COURT:  Mr. Edmonds, the crimes that you committed

22     are among the most serious and severe that anyone can commit.

23     Your actions evidence nothing more but utter hatred and disdain

24     for this country, for its citizens, and those who live here.  I

25     hope that you use your sentence to consider your actions, to

1   learn from them, and to decide to take a different path.

2           Based upon all of these factors as well as the other

3   factors enumerated in 18 U.S.C. Section 3553(a), I hereby

4   accept the plea agreement, and in accordance with that

5   agreement hereby impose a sentence of 21 years, 252 months, of

6   imprisonment.  I believe based upon the record that such a term

7   is sufficient but not greater than necessary to impress upon

8   defendant respect for the law, to provide just punishment for

9   the offense, as well as to deter similar crimes by similar

10  defendants, and satisfy the other purposes of Section 3553(a).

11          I find that the aggravating factors related to the

12  circumstances of the offense that I have discussed considerably

13  outweigh the mitigating factors related to his criminal history

14  and his personal background.

15          In addition to the term of imprisonment, I hereby

16  impose a period of supervised release of 20 years.  I believe

17  that given the age of the defendant upon his release, that 20

18  years will be sufficient in light of and necessary in light of

19  defendant's need to reintegrate into society once he is

20  released and obtain the necessary supervision and care in light

21  of the nature of the crimes.  I believe that any more than 20

22  years, which would extend beyond the age when defendant is 70,

23  is greater than necessary for the purposes of Section 3553(a).

24          Within 72 hours of release from the custody of Bureau

25  of Prisons, defendant shall report in person to the probation

1    office in the district to which he is released.

2          With regard to conditions of supervised release, as

3    part of supervised release the Court believes it is necessary

4    to impose the following conditions:

5          With regard to mandatory conditions, it is ordered

6    that during supervised release defendant not commit another

7    federal, state or local crime; that he not unlawfully possess a

8    controlled substance; and that he cooperate in the collection

9    of a DNA sample if collection of such a DNA sample is required

10   by law; and that in light of his history of marijuana use, he

11   refrain from any unlawful use of a controlled substance, and

12   submit to one drug test within 15 days of release on supervised

13   release, and at least two periodic tests thereafter up to 104

14   periodic tests for use of a controlled substance during each

15   year of supervised release.

16         With regard to discretionary conditions, it is ordered

17   that during his period of supervised release that he seek and

18   work conscientiously at lawful employment or pursue

19   conscientiously a course of study or vocational training that

20   will equip him for employment.  And that he refrain from

21   knowingly meeting or communicating with any person whom he

22   knows to be engaged in or planning to be engaged criminal

23   activity.

24         It is also ordered that he refrain from possessing a

25   firearm or destructive device or other dangerous weapon, and

1    that he remain within the jurisdiction where he is being

2    supervised unless granted permission to leave by the Court or

3    the probation officer.

4            It is also ordered that he report to the probation

5    officer as directed by the Court or the probation officer, and

6    that he permit a probation officer to visit him at any

7    reasonable time with his agreement at home, at work or other

8    reasonable location, and that he permit the confiscation of any

9    contraband observed in plain view of the probation officer

10   during such visits.

11           It is also ordered during supervised release that he

12   notify probation officer promptly, within 72 hours, of any

13   change in address of residence, employer or workplace; and

14   absent constitutional or other legal privilege answer inquires

15   by the probation officer.  It is also ordered that he notify

16   probation officer promptly, within 72 hours, if arrested or

17   questioned by a law enforcement officer.

18           With regard to special conditions, it is ordered that

19   during supervised release that he participate in an approved

20   job skill training program at the direction of probation

21   officer within the first 60 days of placement on supervision.

22   And that if he is unemployed after the first 60 days of

23   supervision or if he is unemployed for 60 days after

24   termination or layoff from employment, that he perform at least

25   20 hours of community service per week at the direction of the

1    United States Probation Office until gainfully employed.  And
2    that the amount of community service shall not exceed 300
3    hours.
4         With regard to the computer internet monitoring
5    program, the Court believes that it is necessary to impose that
6    condition in light of the nature and circumstances of the
7    offense here and defendant's use of internet in order to carry
8    out activities related to his crimes.  And, therefore, it is
9    ordered that during supervised release the defendant shall
10   comply with the requirements of the computer internet
11   monitoring program as administered by the United States
12   Probation Office, and that he shall consent to installation of
13   computer monitoring software on all identified computers to
14   which he has access.  And that the software may restrict and/or
15   record any and all activity on the computer, including the
16   capture of key strokes, application information, internet use
17   history, e-mail correspondence and chat conversations.
18        A notice will be placed on the computer at the time of
19   installation to warn others of the existence of the monitoring
20   software.  And it's ordered that the defendant shall not
21   remove, tamper with, reverse engineer or in any way circumvent
22   the software.
23        With regard to the cost of the monitoring, in light of
24   defendant's condition, the Court will not impose the cost of
25   the monitoring.  However, during supervised release if the

1    probation office thinks that defendant's financial

2    circumstances has changed sufficiently, probation officer can

3    ask the cost of monitoring -- file a motion with the Court

4    requesting the cost of monitoring at that time.

5         Furthermore, the Court declines to impose the added

6    provision that states, quote:  The defendant shall provide the

7    probation officer a copy of his telephone bills or credit card

8    statements received and other financial information requested,

9    end quote.  I don't believe that that is necessary in light of

10   the nature and circumstances of the offense.

11        I will, however, order that during supervised release

12   that defendant not enter into any agreement to act as an

13   informer or special agent or law enforcement agency without the

14   permission of the Court.  I believe that that is necessary to

15   facilitate the appropriate and effective supervision of the

16   defendant during the period of supervised release.

17        Finally, the government requests an additional

18   condition of supervised release that prior to obtaining

19   employment, defendant first obtain the approval of the

20   probation officer to allow the probation officer the

21   opportunity to assess the level of risk to the community that

22   the defendant would pose if employed in a particular capacity.

23   In light of the circumstances and the nature of the criminal

24   activity in this case and the potential that it endangered

25   hundreds of lives, the Court believes that imposing that

1   condition is necessary and appropriate in this case.

2         Mr. Graham, do you have any other objections to the

3   conditions of supervised release other than what you have

4   already argued?

5         MR. GRAHAM:  No, Judge.  We were also recommending

6   that your Honor recommend the facility close to Philadelphia,

7   Pennsylvania.

8         THE COURT:  Any objection?

9         MR. JONAS:  No objection, Judge.

10        THE COURT:  The Court will enter that recommendation.

11  The Court will recommend that the Bureau of Prisons locate

12  defendant in the appropriate facility as close to Philadelphia,

13  Pennsylvania as possible.

14        Does the government have any objections to the

15  conditions of supervised release that I have stated?

16        MR. JONAS:  No, Judge.

17        THE COURT:  All right.  So the conditions as stated

18  will be imposed.

19        In light of defendant's current financial condition,

20  the fine will be deemed waived.  And the Court will impose a

21  special assessment of $200.

22        The Court finds that the sentence as I have stated it

23  today is sufficient but not greater than necessary to satisfy

24  the purposes of 18 U.S.C. Section 3553(a).

25        Mr. Graham, are there any other arguments in

1    mitigation that I failed to address?

2              MR. GRAHAM:  No, Judge.

3              THE COURT:  Do you have any legal objection to the

4    sentence that I have proposed or request any further

5    elaboration of my reasons both as to the term of imprisonment

6    or the conditions of supervised release?

7              MR. GRAHAM:  No.

8              THE COURT:  Mr. Jonas, how about the government?

9              MR. JONAS:  No, Judge.

10             THE COURT:  Very well.  The sentence and judgment will

11   be entered accordingly.

12             Mr. Edmonds, as part of your plea agreement, you have

13   waived your right to appeal your conviction and any pretrial

14   rulings by the Court and any part of the sentence or the manner

15   in which it was determined, including any term of imprisonment

16   and fine within the maximums provided by law.  Additionally,

17   you have agreed to waive your right to challenge your

18   conviction and sentence and the manner in which it was

19   determined at any collateral attack or future challenge,

20   incurring but not limited to a motion brought under 28 U.S.C.

21   Section 2255.

22             However, Mr. Edmonds, I do want to inform you that

23   your waiver of appellate rights does not apply to a claim of

24   involuntariness or ineffective assistance of counsel which

25   related directly to the waiver or its negotiation.  Nor are you

1   prohibited from seeking a reduction in the sentence based

2   directly on a change in the law that is applicable to you and

3   that prior to the filing of any request for relief has been

4   expressly made retroactive by an act of Congress, the United

5   States Sentencing Commission or the Supreme Court.

6         In the event that you wish to file an appeal, any

7   appeal must be filed within 14 calendar days of the entry of

8   the judgment of conviction.  If you cannot afford to appeal,

9   you have the right to apply for leave to appeal in forma

10   pauperis, and the clerk of the court will prepare and file a

11   notice of appeal upon your request.

12         Any other issues that we need to address, Mr. Jonas?

13         MR. JONAS:  One housekeeping matter, your Honor.

14   Defendant pled to a superseding information.  So we move to

15   dismiss the indictment filed against him.

16         THE COURT:  Any objection?

17         MR. GRAHAM:  No, Judge.

18         THE COURT:  The government's motion is granted.

19         Mr. Graham, anything else we need to address today?

20         MR. GRAHAM:  No.

21         THE COURT:  Very well.  We are adjourned.

22         MR. JONAS:  Thank you, Judge.

23      (Which were all the proceedings heard in this case.)

24

25

1                        CERTIFICATE

2              I HEREBY CERTIFY that the foregoing is a true, correct

3     and complete transcript of the proceedings had at the hearing

4     of the aforementioned cause on the day and date hereof.

5

6      /s/Alexandra Roth                        12/18/2017

7     _____      _____
       Official Court Reporter                        Date
       U.S. District Court
8      Northern District of Illinois
       Eastern Division
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25